IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Southern Division
7:24-CV-4-BO-BM

| | | |
|---|---|---|
| MORAG BLACK POLASKI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **DEFENDANTS' BRIEF IN** |
| v. | ) | **SUPPORT OF MOTION TO DISMISS** |
| | ) | |
| ERNIE LEE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants Ernie Lee, Benjamin R. David, Nancy Lorrin Freeman, Ashlie Shanley, and Spencer B. Merriweather III, in their official capacities as District Attorneys of their respective prosecutorial districts (the "District Attorneys"), and A. Todd Brown, in his official capacity on behalf of the North Carolina State Bar (the "State Bar"), jointly and respectfully submit this brief in support of their motion to dismiss Plaintiffs' first amended complaint.

This First Amendment challenge to the North Carolina statutes prohibiting the unauthorized practice of law by nonlawyers (as further described below, the "UPL Statutes") is controlled by *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), *cert. denied*, 140 S.Ct. 666 (2019) ("*CAI*"). In *CAI*, the Fourth Circuit unanimously held that the UPL Statutes regulate conduct, to wit, the practice of law, with only an incidental impact on speech. The court then held that the UPL Statutes should be evaluated under intermediate scrutiny, as required by *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"), and that the statutes pass constitutional muster. Applying this controlling authority, the same result should be reached here, at the pleadings stage.

## BACKGROUND

I.      **The UPL Statutes**

Under longstanding North Carolina law, only licensed attorneys are authorized to practice law. N.C. Gen. Stat. § 84-4. While there is no statutory definition of a "paralegal," nor a required license, nor any statutory requirements for what kind of work is typically performed by a paralegal, the law is clear that only licensed attorneys may practice law. The prohibition on unauthorized practice applies to individuals and entities. *Id.* Corporations and associations, in general, are not authorized to practice law, either through non-attorneys or through attorney-employees or attorney-members. N.C. Gen. Stat. §§ 84-4, 84-5; *CAI*, 922 F.3d at 202, 209. Exceptions to this prohibition include professional corporations organized under Chapter 55B of the General Statutes, public interest law firms, in-house counsel, legal clinics, and limited instances when a corporation acts in a fiduciary capacity. *See* N.C. Gen. Stat. §§ 84-4, 84-5(a), 84-5(b), 84-5.1, 84-7.1.

The practice of law is itself defined in the General Statutes. *See* N.C. Gen. Stat. § 84-2.1(a). It includes preparing legal instruments such as deeds, preparing documents to be filed in court proceedings, "assisting by advice, counsel, or otherwise in any legal work," and "advis[ing] or giv[ing] opinion upon the legal rights of any person, firm, or corporation." *Id.* These are activities that only a licensed attorney may perform, either directly or, in some instances, by supervising nonlawyer assistants such as paralegals. *See* N.C. Gen. Stat. § 84-4; N.C. R. Prof'l Conduct r. 5.3 (2016) (governing attorney responsibilities regarding nonlawyer assistants); *id.*, Comment 2 (noting that "paraprofessionals … act for the lawyer in rendition of the lawyer's professional services," and that "[t]he measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline"). The General Statutes also include some exceptions to the conduct that constitutes the practice of law, such as

2

preparing mediation summaries and certain real estate transaction documents, N.C. Gen. Stat. § 84-21(b), and the operation of certain interactive software that can generate legal documents (e.g., LegalZoom), N.C. Gen. Stat. § 84-2.2.

North Carolina's restrictions on unauthorized practice are not a matter of the State Bar's policy preferences or the District Attorneys' prosecutorial discretion. In North Carolina, these are statutory requirements. The General Assembly has reserved for itself the authority to define the conduct that constitutes the practice of law in this state, and who may lawfully engage in that conduct. (*See* Am. Compl. ¶ 54 (acknowledging that "significant reforms would ultimately require amendments to North Carolina's UPL statutes and regulations").)[1] Defendants have been charged by the General Assembly with responsibility for criminal and civil enforcement of these requirements. District attorneys are authorized to seek injunctions, and to bring criminal charges, against people and entities that engage in the unauthorized practice of law. N.C. Gen. Stat. § 84-7. The State Bar is authorized to investigate and seek civil injunctions restraining unauthorized practice. N.C. Gen. Stat. § 84-37.

The State Bar has also been charged with disciplinary jurisdiction over "[a]ny attorney admitted to practice law in this State," including the duty to investigate allegations and grievances about attorney misconduct. N.C. Gen. Stat. § 84-28(a). It also

---

[1] Other states allocate this authority in different ways. *See, e.g.*, S.C. Code Ann. §§ 40-5-20 (authorizing South Carolina Supreme Court to "prescribe, adopt, promulgate and amend such rules and regulations as it may deem proper ... defining and regulating the practice of law"), 40-5-310 (limiting practice of law to persons "enrolled as a member of the South Carolina Bar pursuant to applicable court rules, or otherwise authorized to perform prescribed legal services by action of the Supreme Court of South Carolina"); Va. Code Ann. §§ 54.1-3909 (authorizing Virginia Supreme Court to "promulgate rules and regulations … [d]efining the practice of law"), 54.1-3910 (authorizing Virginia Supreme Court to "promulgate rules and regulations organizing and governing the Virginia State Bar," and requiring that "[a]ll persons engaged in the practice of law in the Commonwealth shall be active members in good standing of the Virginia State Bar").

proposes rules and regulations, such as the Rules of Professional Conduct, for consideration and approval by the Chief Justice of the North Carolina Supreme Court. N.C. Gen. Stat. § 84-21(b).

## II.    Plaintiffs' Claims

Plaintiffs Polaski and Almendarez work as paralegals, and have met the requirements of the North Carolina Certified Paralegal program, a voluntary certification. (Am. Compl. ¶¶ 10-11.)  They are also "charter members" of Plaintiff North Carolina Justice for All Project ("JFAP"), which allegedly is a North Carolina unincorporated nonprofit association. (*Id.* ¶¶ 12, 57.)

Plaintiffs have sued the District Attorneys and State Bar under 42 U.S.C. § 1983 and the First Amendment's freedom-of-speech clause, as incorporated by the Fourteenth Amendment.  Plaintiffs allege that the First Amendment entitles them to give legal advice to third parties and, in effect, to ghostwrite court forms, without regard for North Carolina's General Statutes to the contrary. (Am. Compl. ¶¶ 84, 86.)  Plaintiffs would give "legal advice [that] would be tailored to the litigant's factual circumstances and legal goals," including "what forms to file" and "what information to include on the forms." (*Id.* ¶¶ 84, 86.)  The individual Plaintiffs would charge fees for this work, and along with JFAP they would also offer some services for free at clinics. (*Id.* ¶¶ 89-91.)  While this lawsuit is supposedly an as-applied challenge, Plaintiffs contend that allowing these paralegals to charge for legal services would "encourage[] others to provide legal advice." (*Id.* ¶ 93.)

After acting as shadow counsel, Plaintiffs would send their clients, armed with ghostwritten court forms and appearing *pro se*, into the state courts to initiate litigation or, perhaps, to respond to litigation initiated against them.  Plaintiffs would not be accountable to the courts in which their clients appear, nor to the State Bar's disciplinary jurisdiction.

Indeed, it is striking that Plaintiffs' theory is based on cherry-picking one aspect of the practice of law – giving legal advice – while casting off the responsibilities that go along with the practice of law. (*See* Am. Compl. ¶ 125 (rejecting need to obtain legal education, pass bar exam, meet character and fitness requirements, and satisfy CLE requirements, in order to offer legal services to the public).) This is the only way that Plaintiffs could even attempt to characterize their proposal as limited to "pure speech" (although this assertion is not plausible under *Iqbal/Twombly*). But it is the requirements and responsibilities that go along with the practice of law that ensure clients receive reliable legal advice on which they should base important decisions. These requirements and responsibilities also ensure that the administration of justice proceeds in an orderly manner.

Clients can rely on attorney advice because attorneys owe fiduciary duties to their clients. Plaintiffs do not propose that this Court create a new paralegal/client fiduciary duty. Clients can confidentially provide information about their legal matters to an attorney, and confidentially receive legal advice, because of the attorney/client privilege. The privilege allows open and complete communications that will yield the best advice for the client. It also ensures that attorneys will not divulge their client's confidential communications. The law provides space for attorneys to confidentially develop the legal advice or other solutions needed by their clients, through the attorney work product doctrine. Plaintiffs do not propose that this Court create a new paralegal/client privilege, a new paralegal work product doctrine, or otherwise require paralegals practicing law to keep their clients' communications and information confidential.

To ensure attorneys are carrying out their fiduciary duties to their clients, they must follow the Rules of Professional Conduct. For example, the RPCs define the attorney's duty of competence. *See* N.C. R. Prof'l Conduct r. 1.1 (2014). This duty allows a client to reasonably trust that their attorney is sufficiently knowledgeable about the subject matter

5

of the engagement. Plaintiffs propose no analogous duty. Instead, Plaintiffs appear to brush the question of competence aside by insisting they only "want to provide <u>simple</u> legal advice to North Carolinians about how to properly fill in common, court-created legal forms." (Am. Compl. ¶ 1 (emphasis added).) But still water often runs deep, and a façade of simplicity often hides complexity that requires careful counsel. For example, a potential plaintiff who initiates litigation subjects himself to the court's jurisdiction and invites counterclaims. The plaintiff could also waive other compulsory claims that are outside the scope of the court forms. A defendant could similarly fail to pursue counterclaims or assert other important defenses that are outside the scope of court forms.

It is not only the client's rights that are impacted by the "simple" matters that Plaintiffs want to work on. (*See id.* ¶ 68 (listing types of matters).) Instead, these kinds of cases are some of the most fraught with impact on third parties. Absolute divorce, at a minimum, impacts both spouses in one of the most significant ways possible. Child custody and visitation cases impact minors. Estate administration impacts heirs and known and unknown creditors. Domestic violence protective orders and civil no-contact orders implicate a host of concerns for all parties involved. Even summary ejectments affect both the tenant and the landlord, and could implicate other claims for damages. (It is not clear whether Plaintiffs propose to represent tenants, or landlords, or both, in these matters.)

The Rules of Professional Conduct also define the attorney's duty of loyalty, and how to avoid conflicts of interest. *See* N.C. R. Prof'l Conduct r. 1.7-1.13. Plaintiffs propose no analogous duty, nor do they offer any mechanism for avoiding conflicts of interest that could arise from the paralegal's prior employment, from their work for other clients, or from personal considerations. The Rules also define a host of other requirements for attorneys and protections for clients, such as limitations on misleading advertising, harmful financial arrangements, and improper personal relationships. *See* N.C. R. Prof'l Conduct r. 1.5, 1.8,

6

1.19, 7.1, 7.2. The State Bar Rules establish continuing education requirements. *See* 27 N.C. ADMIN. CODE 01D.1518 (2024). Plaintiffs propose no analogous rules or requirements.

In turn, the clients of lawyers are protected from improper legal work, and have recourse when malpractice occurs, through a variety of means. In litigation, attorneys are subject to the court's jurisdiction, through procedural mechanisms like Rule 11 and the court's inherent authority. Plaintiffs seem to have structured their proposal to avoid judicial oversight. The State Bar is charged with operating a disciplinary system for receiving grievances, investigating, and prosecuting violations of the Rules of Professional Conduct. Plaintiffs seem to have structured their proposal to eliminate the current way that the State Bar can indirectly supervise paralegal conduct (by disciplining attorneys who permit improper paralegal conduct to occur). (*See* Dkt. 17-1 at 2 ("The State Bar regulates the activities of paralegals indirectly through each lawyer's professional duty to supervise employees and contractors to whom legal work is delegated.").) The State Bar also operates other programs that allow for resolution of conflicts in the attorney-client relationship, such as the Fee Dispute Resolution Program. *See* 27 N.C. ADMIN. CODE 01D.0701, *et seq.* Finally, when an attorney commits professional malpractice, state law provides clients with a tort claim to seek recompense. Plaintiffs propose no analogue, which is unsurprising when their proposed practice would not be governed by any of the traditional standards that govern the practice of law. Ultimately, Plaintiffs should not be heard to frame the question before the Court by picking-and-choosing which parts of the practice of law they want to apply to them, any more than an attorney appearing before this Court could choose which provisions of Local Civil Rule 83.1 they must follow.

## III. Procedural history

Plaintiffs first sued the Attorney General of North Carolina on 4 January 2024. (Dkt. 1.) They alleged the UPL Statutes violate the First Amendment's freedom-of-speech

7

clause, as applied to Plaintiffs' desire to practice law by giving free (count one) and paid (count two) legal advice. (*Id.* at ¶¶ 131-62.) Plaintiffs sought a declaratory judgment and permanent injunction. (*Id.* at 23.) On 26 February 2024, the Attorney General moved to dismiss on several grounds. (Dkts. 13-14.) The motion argued that Plaintiffs lacked standing to sue the Attorney General, who does not have enforcement authority over the UPL Statutes and therefore does not pose a credible threat of prosecution, that Plaintiffs' claims against the Attorney General were barred by the Eleventh Amendment, and that Plaintiffs' challenge to the UPL Statutes is foreclosed by *CAI*. (*Id.*)

In lieu of responding to the motion, Plaintiffs filed their amended complaint on 18 March 2024. (Dkt. 16, Am. Compl.) The amended complaint essentially operates as a substitution of parties, in that it no longer asserts claims against the Attorney General, and instead names the District Attorneys and State Bar. Other than perfunctory descriptions of the new Defendants and their roles under the UPL Statutes, however, the amended complaint alleges the same facts and asserts the same claims. In fact, despite the Attorney General's discussion of *CAI*, the 171-paragraph amended complaint does not acknowledge that decision, much less attempt to conform its claims and legal assertions to the controlling authority. (*See generally id.*)

## **ARGUMENT**

### I. **Standard of review**

A Rule 12(b)(6) motion tests the sufficiency of the complaint, which must allege enough facts to state a claim for relief that is facially plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Facial plausibility means that the facts pled 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice." *Oak Grove Techs., LLC v. Attwa*, 2024 WL 84703, at *3 (E.D.N.C. Jan. 8, 2024)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In other words, the facts alleged must allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." *Wright v. eClerx, LLC*, 2023 WL 3292877, at *1 (E.D.N.C. May 5, 2023). When undertaking this review, "[t]he court 'need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Id.* (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

As discussed below, the constitutionality of the UPL Statutes is determined under intermediate scrutiny. "To survive intermediate scrutiny, the defendant must show 'a substantial state interest' and a solution that is 'sufficiently drawn' to protect that interest." *CAI*, 922 F.3d at 209 (quoting *NIFLA*, 585 U.S. at 773). The Fourth Circuit has described this as a "loosened intermediate-scrutiny test" and "a more relaxed form of intermediate scrutiny" for regulations focused on professional conduct. *360 Virtual Drone Servs. LLC v. Ritter*, -- F.4th --, 2024 WL 2263404, at *5, 9 (4th Cir. May 20, 2024).[2] It is appropriate to apply intermediate scrutiny to as-applied claims at the Rule 12 stage. *See, e.g.*, *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 & n.3 (4th Cir. 2012).

## II.    Overview of *CAI* litigation

Because Plaintiffs' claims are controlled by *CAI*, some background on that case is warranted. CAI was a North Carolina trade association, comprised of employers throughout the state. *CAI*, 922 F.3d at 202. Thus, CAI was made up of members, similar to JFAP. (Am. Compl. ¶¶ 10, 11, 57.) *See* N.C. Gen. Stat. §§ 59B-2(2) (defining a "[n]onprofit association" as "an unincorporated organization … consisting of two or more

---

[2] The Fourth Circuit issued its published decision in *360 Virtual Drone Services* on the same day that the instant motion has been filed.

members joined by mutual consent for a common, nonprofit purpose"); 59B-5(a) (confirming that "[a] nonprofit association is a legal entity separate from its members").

CAI sought to offer legal services to its members through attorneys that it employed. This meant that CAI itself would be practicing law, which is a prohibited form of corporate practice. CAI sought to practice law in two ways. First, it wanted its attorney-employees to "answer questions about employment and labor law." *CAI*, 922 F.3d at 202. It also wanted its attorney-employees to "help [members] draft legal documents (such as contracts or employee handbooks)." *Id.* Under CAI's plan, most of these legal services would be offered "without charge as part of its membership fees," but "it would charge hourly fees for certain services." *Id.* at 202-03. Although CAI wanted to offer legal services through attorney-employees, "its directors and officers [did not] have to be lawyers and thus wouldn't have obligations under the State Bar's Rules of Professional Conduct." *Id.* at 203.

Like Plaintiffs here, CAI first attempted "lobbying efforts to change the law." *Id.* at 202. In 2011 and 2013, its lobbyists unsuccessfully pushed for legislation that would legalize the practice of law by corporations. *Id.* at 203. CAI also submitted a proposal to the State Bar describing its proposed practice, and the State Bar issued a proposed ethics opinion advising that CAI's plan would violate the UPL Statutes. *Id.*

Also like Plaintiffs here, after failing "to achieve its goals through legislation, CAI turned to the courts." *Id.* CAI filed suit in 2015 against the Attorney General and several district attorneys, and the State Bar intervened as a defendant. CAI sought declaratory and injunctive relief that would allow it to practice law. Among other claims, CAI argued that the UPL Statutes violated the First Amendment's freedom-of-speech clause.[3] The

---

[3] CAI also asserted claims that are not at issue here: substantive due process, freedom of association under the First Amendment, vagueness, advertising speech, and a claim under the North Carolina Constitution's monopoly clause.

Middle District denied CAI's motion for preliminary injunction. *See Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281 (M.D.N.C. 2015). Later, the court granted the State Bar's motion for summary judgment and dismissed the case in its entirety. *See Capital Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374 (M.D.N.C. 2017). CAI appealed and the Fourth Circuit unanimously affirmed. *See CAI*, 922 F.3d 198. CAI filed a petition for writ of certiorari, which the Supreme Court denied. *See CAI*, 140 S.Ct. 666.

When the district court granted the State Bar's summary judgment motion on CAI's freedom-of-speech claim, it applied the Fourth Circuit's professional speech doctrine. Under that doctrine, regulations of the speech of professionals, such as doctors and lawyers, were evaluated under a very lenient set of First Amendment rules. *See NIFLA*, 585 U.S. at 766-67. During the appeal, the Supreme Court issued *NIFLA*, which held that professional speech is not a separate category of speech for First Amendment purposes, and that content-based restrictions on professional speech should be evaluated under strict scrutiny. *Id*. But *NIFLA* also confirmed that "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id*. at 768. In those instances, strict scrutiny is not warranted. As discussed below, the Fourth Circuit followed *NIFLA* when it affirmed the summary judgment order, by applying intermediate scrutiny and finding a substantial state interest in the UPL Statutes and that the statutes were sufficiently drawn to protect that interest.

### III. Intermediate scrutiny applies to the UPL Statutes.

The linchpin of Plaintiffs' claims is their contention that this case is about "pure speech," also dubbed "pure legal advice," and that the UPL Statutes should therefore be subject to strict scrutiny. (Am. Compl. ¶¶ 5, 147, 164.) Plaintiffs' plea for strict scrutiny relies on their argument that "Plaintiffs' advice regarding court-created forms is pure

speech, not a form of occupational conduct of which speech is only an incidental part." (*Id.* ¶¶ 142, 159.) This "pure speech" argument has already been rejected. Like Plaintiffs, CAI sought to give legal advice, and similarly argued "that its proposed legal services are pure speech, as opposed to conduct … because it will be required to communicate in order to provide its proposed services." *CAI*, 283 F. Supp. 3d at 386. *See also CAI*, 129 F. Supp 3d at 295 (noting that "CAI argues that 'legal advice is pure speech,'" and "that the UPL Statutes 'censor that speech based on its content … and the speaker's identity'"). Likewise, on appeal, CAI "describe[d] the UPL Statutes as content-based and identity-based restrictions on speech," because certain speech's characterization as "legal advice" is what triggers the UPL Statutes' prohibition unless the speaker is a lawyer. *CAI*, 922 F.3d at 209 n.4. The Fourth Circuit held that it "need not engage with these descriptors," because "the statutes regulate conduct." *Id.*

In particular, the court squarely held that "any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law." *Id.* at 207. The UPL Statutes do not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." *Id.* at 208. They are content-neutral, because they do not dictate what advice a lawyer may or may not give to a client. To be sure, the content must be legal advice – and therefore the practice of law – to come within the ambit of the UPL Statutes. But the Supreme Court has "consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72 (2022). A regulation fails content neutrality only if it "discriminate[s] based on 'the topic discussed or the idea or message expressed.'" *Id.* at 73-74 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)). *See also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347

(2020) (speaker preference does not trigger strict scrutiny unless it "reflects a content preference" (quoting *Reed*, 576 U.S. at 170)).[4]

Instead of regulating the content of legal advice, the UPL Statutes "focus more broadly on the question of who may conduct themselves as a lawyer." *CAI*, 922 F.3d at 208. Such "[l]icensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed," like Plaintiffs. *Id.* "But that effect is merely incidental to the primary objective of regulating the conduct of the profession," which the First Amendment permits the states to do, even post-*NIFLA*. *Id.* *See also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 459 (1978) (regulation of the legal profession "is a subject only marginally affected with First Amendment concerns"); *360 Virtual Drone Servs.*, 2024 WL 2263404, at *8 (4th Cir. May 20, 2024) (noting that *CAI* "involved a classic regulation of conduct with an incidental burden on speech," because the UPL Statutes "prohibited certain entities from offering legal services or advice (speech that has economic and legal consequences), and had no readily apparent implications for unpopular or dissenting speech"); *360 Virtual Drone Servs. LLC v. Ritter*, 2023 WL 2759032, at *11 (E.D.N.C. Mar. 31, 2023) (holding that North Carolina's surveyor licensing requirement was not content-based because it "does not control what surveyors may tell their clients," and instead controls who may conduct themselves as a surveyor), *aff'd*, -- F.4th --, 2024 WL 2263404 (4th Cir. May 20, 2024). The Fourth Circuit therefore rejected CAI's argument for strict scrutiny. Instead, the court held

---

[4] Under this rubric, *NIFLA* applied strict scrutiny because the challenged statute compelled medical providers to convey a particular message to patients. *NIFLA*, 585 U.S. at 766. It thus dictated the contents of communications within the doctor-patient relationship. In *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), strict scrutiny applied because the ordinance dictated the contents of communications within the therapist-patient relationship by prohibiting counseling regarding certain subjects. In *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010), strict scrutiny applied because the challenged statute prohibited material support to a terrorist group, and applied to the speech at issue because of its content, regardless of the speaker. No licensing regime was involved.

13

that "intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech," like the UPL Statutes' prohibition on the practice of law by nonlawyers. *CAI*, 922 F.3d at 209. This motion and brief therefore address the application of the intermediate scrutiny test required in the Fourth Circuit, and show that North Carolina has a substantial interest and that the UPL Statutes are sufficiently drawn.

## IV.     North Carolina's interest is at least substantial.

The Fourth Circuit has already held that North Carolina has a substantial interest in prohibiting the practice of law by nonlawyers. Specifically, it held that "North Carolina's interest in regulating the legal profession to protect clients is at least substantial." *Id.* (noting also that "the Supreme Court has repeatedly described the interest in even stronger terms"). *See also Ohralik*, 436 U.S. at 460 ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions."); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."); *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 159 (1971) (holding that states are constitutionally permitted to establish character and fitness requirements for admission to the bar); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 40-41 (1961) (holding that states may require bar applicants to establish good moral character); *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 239 (1957) ("A state may require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar," so long as the qualifications "have a rational connection

14

with the applicant's fitness or capacity to practice law."). Thus, binding Fourth Circuit authority in *CAI* regarding the same statutes challenged here, and the Supreme Court's longstanding recognition of state interests, establish that the UPL Statutes' restriction of the practice of law to licensed attorneys satisfies the first prong of intermediate scrutiny.

**V.     The UPL Statutes are sufficiently drawn.**

Because the state's interest in the prohibition on unauthorized practice is at least substantial, Plaintiffs cannot state a plausible claim if the UPL Statutes are sufficiently drawn. The Fourth Circuit's analysis in *CAI* and the additional facts alleged in the amended complaint confirm that the UPL Statutes are sufficiently drawn to satisfy the second prong of intermediate scrutiny, as applied to Plaintiffs.

In *CAI*, the Fourth Circuit focused on nonlawyers' involvement in the representation of clients. *See CAI*, 922 F.3d at 209. The harms from nonlawyer involvement were present in an organization controlled by nonlawyers that employed lawyers, such as CAI.[5] *Id.* But North Carolina law contains exceptions that were relevant to intermediate scrutiny, such as for private corporations owned by lawyers (i.e., a law firm), as well as public interest law firms. *See id.* The existence of these kinds of exceptions was sufficient to demonstrate that the UPL Statutes were sufficiently drawn.

The same analysis applies here. The statutory prohibition on nonlawyer practice is matched with other opportunities available to Plaintiffs, demonstrating "a reasonable fit between [North Carolina's] UPL Statutes and a substantial government interest." *CAI*, 922 F.3d at 210. *See also 360 Virtual Drone Servs.*, 2023 WL 2759032, at *13 (E.D.N.C. Mar. 31, 2023) (holding that surveyor licensing statute was sufficiently drawn when the

---

[5] If anything, the Fourth Circuit's concern about harm to clients is even more acute here because, unlike in *CAI*, there is no lawyer involved in the representation under Plaintiffs' model. Instead of the clients being represented by attorneys who are supervised by nonlawyers, Plaintiffs' clients would not be represented by attorneys at all.

"plaintiffs' actions only are restricted to the extent they seek to create maps or models conveying location information or property images capable of measurement," and did not apply when the "plaintiffs seek only to convey images, including images with lines indicating the position of property boundaries"). This test does not require "specific evidence," because "reli[ance] on common sense" is sufficient. *360 Virtual Drone Servs.*, 2024 WL 2263404, at *10 (4th Cir. May 20, 2024) (discussing the Fourth Circuit's analysis of the UPL Statutes in *CAI*).

The General Statutes prohibit the most concerning conduct, which is the practice of law by an unsupervised nonlawyer who lacks the training, duties, professional requirements, and court- and bar-oversight, and who does not operate within the scope of the attorney-client privilege and attorney work product doctrine. But the law offers numerous opportunities for paralegals to participate in the legal system and in the delivery of legal services, so long as the crucial requirement of attorney oversight is satisfied, or when their conduct is not within the ambit of the practice of law.

First, the UPL Statutes do not prohibit paralegals from engaging in speech that merely includes legal information. (*See, e.g.*, Dkt. 17-2 at 4 (noting that nonlawyers may sell or distribute "[g]eneralized legal statements and opinions, not tailored to any specific or particular situation, [which] do not constitute the unauthorized practice of law").) Thus, Plaintiffs can create YouTube videos and offer seminars, for free or for a fee, in which they describe the law. What Plaintiffs cannot do is offer legal advice – that is, legal solutions tailored to a client's specific facts – without attorney supervision. (*See, e.g.*, *id.* ("However, if a nonlawyer attempts to meet with a person, discuss the person's particular situation, or assist the person in filling out a form legal document, the nonlawyer is committing the unauthorized practice of law.").) *See also* N.C. Gen. Stat. § 84-2.1(a) ("to advise or give opinion upon the legal rights of any person"); *CAI*, 283 F. Supp. 3d at 389 (describing "legal

16

advice" as "applying a legal solution to specific facts" (internal quotation omitted)); *N.C. State Bar v. Lienguard, Inc.*, 2014 NCBC LEXIS 11, ¶¶ 70-71, 2014 WL 1365418, at *12 (N.C. Super. Ct. Apr. 4, 2014) ("legal advice" includes "the providing of specific legal information in relation to specific facts" (internal quotation omitted)). Plaintiffs do not plausibly allege that their desired videos or seminars would include "legal advice" in this manner, and those activities are therefore not prohibited by the UPL Statutes.

Second, North Carolina law permits individuals to work as paralegals in a wide variety of settings. The state "recogniz[es] the value of paralegals as a cost effective delivery of legal services." (Dkt. 17-1 at 2.) In many ways, paralegals can provide services to the public and contribute to the administration of justice. Paralegals work for private practitioners and firms. Paralegals can also work as independent contractors to attorneys. *See* N.C. RPC Op. 216 (July 18, 1997). Paralegals work at nonprofit law centers. (Am. Compl. ¶ 62.) Paralegals work for the government, including the court system. (*Id.* ¶ 63.) Paralegals can work for legal aid organizations and for clinics. And they can "volunteer[] their legal services for free," with appropriate attorney supervision, as Plaintiffs have done. (*Id.* ¶ 42.) In these settings, Plaintiffs can assist clients with filling out court forms. (*Id.* ¶¶ 60 (noting that Ms. Morag "has filled those forms out countless times under the supervision of a lawyer"), 77.) Additionally, nothing in North Carolina law prohibits paralegals from practicing in certain federal forums that have unique rules regarding the scope of practice. (*Id.* ¶ 117.) North Carolina lawyers can even employ paralegals to engage in this form of limited representation. *See* N.C. Formal Ethics Op. 2 (Apr. 15, 2005) (confirming that

North Carolina firm can employ nonlawyer to represent claimant before the Social Security Administration).[6]

Indeed, North Carolina law encourages the delivery of legal services by paralegals, through the voluntary paralegal certification program. This program is meant to "assist in the delivery of legal services to the public by identifying" paralegals who "are qualified by education and training and have demonstrated knowledge, skill, and proficiency to perform substantive legal work under the direction and supervision of a licensed lawyer," or who "may be otherwise authorized by applicable state or federal law to provide legal services directly to the public." 27 N.C. ADMIN. CODE 01G.0101 (2024). The law also provides a private cause of action, and for the State Bar to investigate and enjoin, instances of unauthorized use of the "certified paralegal" designation. *See* N.C. Gen. Stat. §§ 84-10.1, 84-37(a). However, as noted above, certification is not required to work as a paralegal in North Carolina, and there is no difference between the acts that can be performed by certified and non-certified paralegals.

The broad scope of lawful paralegal practice should be viewed in conjunction with the broad resources available to the *pro se* litigants in North Carolina whom Plaintiffs see as prospective clients. Through this lens, it is even more apparent that the UPL Statutes are sufficiently drawn. As Plaintiffs acknowledge, the North Carolina Administrative

---

[6] Of course, the Supremacy Clause requires that a federal rule allowing nonlawyer practice in a federal forum will trump a contrary state restriction. *See Sperry v. State of Fla. ex rel. Fla. Bar*, 373 U.S. 379, 383-84 (1963) (holding that Florida could not prohibit nonlawyers from practicing before the Patent Office under federal rules, even though "in the absence of federal legislation, it could validly prohibit nonlawyers from engaging in the circumscribed form of patent practice"). *Sperry* establishes, however, that the state could preclude nonlawyer representation before the Patent Office but for the special federal rule. *Id.* This highlights a tension in this case. Plaintiffs are not asking this Court to allow them to ghostwrite forms filed in federal proceedings. Their demand is for the federal court to allow them to represent clients who would be filing state court forms in state court proceedings. At least, that is what they are "particularly interested" in doing. (Am. Compl. ¶ 68.)

18

Office of the Courts ("NCAOC") publishes forms that *pro se* litigants can complete, along with instructions. (Am. Compl. ¶¶ 2, 67-71.) These forms "are not complicated." (*Id.* ¶ 2.) The court system also publishes articles on an extensive set of "Help Topics."[7] Plaintiffs collectively refer to these materials as "packets, guidelines, or landing pages." (*Id.* ¶ 71.)[8] For example, Plaintiffs are "interested in providing legal advice on court-created forms" for summary ejectment. (*Id.* ¶ 68.a.) The court system already publishes instructions for that form, AOC-CVM-201.[9] Plaintiffs express the same interest regarding forms for summary administration of estates. (*Id.* ¶ 68.f, g.) The court system already publishes a detailed guide for executors.[10] The court system also publishes instructions for domestic violence forms.[11] (*Id.* ¶ 68.c.) It has also developed a "Guide & File" system that litigants can use to "generate[] the appropriate legal documents" by responding to questions about their matter. (*Id.* ¶¶ 72-73.) In these ways and others, North Carolina has held true to the principle that the UPL Statutes were "not enacted for the purpose of conferring upon the legal profession an absolute monopoly in the preparation of legal documents; its purpose is for the better

---

[7] *Help Topics*, NORTH CAROLINA JUDICIAL BRANCH, https://www.nccourts.gov/help-topics.

[8] The Amended Complaint extensively refers to the nccourts.gov website operated by NCAOC, and references or quotes state government publications. (*See, e.g.*, Am. Compl. ¶¶ 24, 67, 70-76.) The exhibits to the amended complaint include material from the State Bar's websites. (*See id.* ¶¶ 105-10; Dkts. 17-1, 17-2.) The web-based materials cited herein may therefore be considered in connection with this motion. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (holding that court may consider materials integral to and explicitly relied on in a complaint when deciding a motion to dismiss). Additionally, materials published by the state courts are independently subject to judicial notice. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 424 n.3 (2004) (holding that court may take judicial notice of information on a state government website when deciding a Rule 12(b)(6) motion).

[9] *Instructions to Plaintiff or Defendant*, NORTH CAROLINA JUDICIAL BRANCH (Aug. 2017), https://www.nccourts.gov/assets/documents/forms/cvm201-en.pdf.

[10] *Estate Procedures for Executors, Administrators, Collectors by Affidavit, and Summary Administration*, NORTH CAROLINA JUDICIAL BRANCH (Apr. 2016), https://www.nccourts.gov/assets/documents/forms/e850-en.pdf.

[11] *Instructions for Domestic Violence Forms*, NORTH CAROLINA JUDICIAL BRANCH (Mar. 2022), https://www.nccourts.gov/assets/documents/forms/cv303-instr_2.pdf.

security of the people against incompetency and dishonesty in an area of activity affecting general welfare." *State v. Pledger*, 257 N.C. 634, 637, 127 S.E.2d 337, 339 (1962).

As the Fourth Circuit recognized, intermediate scrutiny acknowledges states' leeway to advance their substantial state interests: "intermediate scrutiny requires only a 'reasonable fit between the challenged regulation' and the state's interest — not the least restrictive means." *CAI*, 922 F.3d at 209-10 (quoting *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)). Thus, it does not matter that "[a]nother state legislature might balance the interests differently," *id.* at 209, or that other states or countries have so-called "plausible regulatory alternatives," (Am. Compl. ¶¶ 151-53, 168-70). Plaintiffs' vague references to different regulatory regimes in Arizona, Utah, England, and Wales are therefore irrelevant to the constitutional adequacy of the UPL Statutes. (*Id.* ¶¶ 5, 151-52, 168-69.) *See also 360 Virtual Drone Servs.*, 2023 WL 2759032, at *13 (E.D.N.C. Mar. 31, 2023) (rejecting the plaintiffs' arguments regarding regulatory alternatives).

In sum, the UPL Statutes are sufficiently drawn to satisfy intermediate scrutiny, and Plaintiffs have not plausibly alleged otherwise. As in *CAI*, the UPL Statutes do not violate the First Amendment when they exclude nonlawyers from the practice of law. The amended complaint should be dismissed.

## VI.     North Carolina's strong state interest in regulating the practice of law counsels against federal court intervention in state regulatory reform.

As alleged by Plaintiffs and confirmed by matters of record, North Carolina's regulation of the practice of law is not static. In our 50-state federal system, particularly in an area of especial state interest like who is authorized to practice law in state court proceedings, these regulatory developments should happen at the state level. *See Goldfarb*, 421 U.S. at 792 ("the States have a compelling interest in the practice of professions <u>within their boundaries</u>" (emphasis added)); *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 273

20

(1957) ("recogniz[ing] the importance of leaving States free to select their own bars"). The amended complaint identifies no plausible constitutional basis for a federal court to short-circuit North Carolina's regulatory reforms or to upset the state's comprehensive system of regulating the practice of law.

The amended complaint includes extensive allegations that demonstrate state-level regulatory reform efforts that have brought some change to the UPL Statutes, although not with the speed or breadth that Plaintiffs desire. For example, Plaintiffs allege that the North Carolina Commission on the Administration of Law and Justice issued a report in 2017 "recommending that the state consider altering its UPL definition and adding a limited licensing program." (Am. Compl. ¶ 39.) In 2016, the General Assembly enacted a new statute authorizing interactive websites that assist in the preparation of legal documents, so long as the sites comply with certain consumer protections. *See* N.C. Gen. Stat. § 84-2.2; (Am. Compl. ¶ 40).

JFAP alleges it submitted proposals to change North Carolina law to the Supreme Court and to the State Bar in 2021. (Am. Compl. ¶ 46.) The State Bar then appointed JFAP's co-founders to its Issues Subcommittee on Regulatory Change. (*Id.* ¶ 50.) Plaintiffs allege the subcommittee published a report in January 2022 recommending the development of a "limited lawyer licensing program" and that the State Bar "explore liberalizing North Carolina's UPL statutes to permit nonlawyers to help draft certain documents and provide other legal services." (*Id.* ¶ 51.)

Plaintiffs next allege that the State Bar created the Access to Justice Committee in 2022, "to recommend initiatives and programs that 'ensure equal access to our system of justice for all those who, because of economic or social barriers, cannot afford or secure adequate legal counsel.'" (*Id.* ¶ 52 (quoting 27 N.C. ADMIN. CODE 01A.0701(a)(9) (2024)).) Ultimately, of course, North Carolina's regulation of unauthorized practice is determined by

the General Assembly, not by the State Bar. According to Plaintiffs, the Access to Justice Committee did not proceed with a legislative effort at that time – but JFAP did. (*Id.* ¶ 54.) Specifically, JFAP submitted a limited licensing proposal to the General Assembly in early 2023. (*Id.* ¶ 55.) These various efforts to explore statutory change have not yet met with what Plaintiffs would characterize as success. (*Id.* ¶ 56.) Nonetheless, the State Bar's Access to Justice Committee continues to carry out its mission.

The State Bar is not alone in considering access to justice issues. In 2005, by order of then-Chief Justice Lake, the North Carolina Supreme Court established the North Carolina Equal Access to Justice Commission, a different body that is currently chaired by Justice Dietz.[12] Since then, the Commission has pursued its "work[] on a variety of strategies to increase access to justice in North Carolina," including "the development of materials and resources to support North Carolinians with civil legal needs who do not have access to attorneys in navigating the court system."[13] The Commission also created the North Carolina Pro Bono Resource Center in 2016, which "focuses on opportunities to address unmet legal needs, creating clinics and other models of service delivery to provide needed legal services...."[14]

---

[12] More information about the North Carolina Equal Access to Justice Commission, which is within the proper scope of consideration in connection with the instant motion, can be found in its most recent annual report and in the current establishing order, issued in 2014. *North Carolina Equal Access to Justice Commission 2022 Impact Report*, NORTH CAROLINA JUDICIAL BRANCH, https://www.nccourts.gov/assets/inline-files/NC-Equal-Access-Justice-2022-Impact-Report.pdf; *Order*, NORTH CAROLINA JUDICIAL BRANCH (Aug. 28, 2014), https://www.nccourts.gov/assets/inline-files/revised-Supreme-Court-order-08.14.pdf.

[13] *North Carolina Equal Access to Justice Commission*, NORTH CAROLINA JUDICIAL BRANCH, https://www.nccourts.gov/commissions/north-carolina-equal-access-to-justice-commission#about-1299.

[14] *North Carolina Pro Bono Resource Center*, NORTH CAROLINA JUDICIAL BRANCH, https://www.nccourts.gov/commissions/north-carolina-equal-access-to-justice-commission/north-carolina-pro-bono-resource-center.

There are also local efforts across the state that reflect the broad focus on access to justice. For example, Plaintiffs allege that the 26th Judicial District (Mecklenburg County) created "self-service clinics for absolute divorce," using "forms created by the NCAOC." (*Id.* ¶ 62.)

In sum, the record shows active consideration of potential regulatory changes by the General Assembly, the North Carolina Supreme Court, the Administrative Office of the Courts, and the State Bar. The law has not changed in the way that Plaintiffs desire, such as to mirror the regimes allegedly in place in Arizona, Utah, England, or Wales, but the First Amendment is not defined by Plaintiffs' regulatory preferences. Instead, the facts alleged in the amended complaint, and other matters of record within the proper scope of judicial notice, demonstrate federalism in action.

## VII. JFAP, an unincorporated nonprofit association, is not authorized to practice law.

Even if Ms. Polaski and Ms. Almendarez had demonstrated a First Amendment right to practice law – they have not – JFAP has not stated a plausible claim that it also has the right to practice law. In *CAI*, the Fourth Circuit upheld North Carolina's restriction on the practice of law by unauthorized entities. JFAP alleges that it is a North Carolina unincorporated nonprofit association, organized under Chapter 59B of the General Statutes. (*Id.* ¶ 12.) No statute authorizes the practice of law by such an entity. *See* N.C. Gen. Stat. §§ 84-4 (prohibiting practice of law by associations of persons); 84-5 (prohibiting corporate practice, with some exceptions); 84-5.1 (authorizing practice by some nonprofit corporations organized under Chapter 55A). For this additional reason, JFAP's claim in Count 1 should be dismissed.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' amended complaint in its entirety and with prejudice.

This the 20th day of May, 2024.

/s/ Stephen M. Russell, Jr.
Alan W. Duncan
N.C. State Bar No. 8736
Stephen M. Russell, Jr.
N.C. State Bar No. 35552
MULLINS DUNCAN HARRELL
   & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@turningpointlit.com
srussell@turningpointlit.com

*Attorneys for Defendant A. Todd Brown,*
*in his official capacity*

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. State Bar No. 45356
NORTH CAROLINA DEPARTMENT
   OF JUSTICE
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: 919-716-0091
Facsimile: 919-716-7655
eobrien@ncdoj.gov
ccarreiro@ncdoj.gov

*Attorneys for Defendants Ernie Lee,*
*Benjamin R. David, Nancy Lorrin*
*Freeman, Ashlie Shanley, and Spencer B.*
*Merriweather III, in their official*
*capacities*

24

**<u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION</u>**

The undersigned hereby certifies that the foregoing document complies with the applicable word limitation in Local Rule 7.2(f)(3). It contains 7,417 words, as counted by word-processing software, excluding the case caption, signature block, required certificates, tables of contents or authorities, attachments, exhibits, affidavits, or other addenda.

This the 20th day of May, 2024.

<u>/s/ Stephen M. Russell, Jr.</u>
Stephen M. Russell, Jr.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notice of filing to all counsel of record.

This the 20th day of May, 2024.

/s/ Stephen M. Russell, Jr.
Stephen M. Russell, Jr.